STEVEN G. KALAR
Federal Public Defender
JODI LINKER
Assistant Federal Public Defender
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:     415.436.7700
Facsimile:      415.436.7706
Jodi_Linker@fd.org

Counsel for Defendant CHAMBERLAIN

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RYAN KELLY CHAMBERLAIN II,<br><br>Defendant. | Case No. CR 14-316 VC<br><br>DEFENDANT'S MOTION TO DISMISS COUNT THREE OF THE  SUPERSEDING INDICTMENT & MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF<br><br>Hearing Date: July 7, 2015<br>Time: 1:00 p.m.<br>Court:  The Honorable Vince Chhabria |

## TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................... 2

INTRODUCTION ......................................................................................................... 2

BACKGROUND ........................................................................................................... 2

   I.   FACTUAL ALLEGATIONS: MR. CHAMBERLAIN IS ALLEGED TO HAVE POSSESSED CRUSHED ROSARY PEAS ................................................................ 2

   II.   THE CHARGED STATUTE: 18 U.S.C. § 175(b), POSSESSION OF A TOXIN ......................... 4

DISCUSSION ............................................................................................................... 6

   I.   COUNT THREE MUST BE DISMISSED BECAUSE 18 U.S.C. § 175(b) IS UNCONSTITUTIONALLY VAGUE AND OVERBROAD ......................................... 6

     A.   The Statute, 18 U.S.C. § 175(b), is Unconstitutionally Vague on Its Face ................................. 6

       1.   *"Biological Agent, Toxin, or Delivery System"* ........................................................ 7

       2.   *"Reasonably Justified"* ................................................................................ 8

       3.   *"Type"* ......................................................................................................... 8

       4.   *"Quantity"* ................................................................................................... 9

       5.   *"Naturally Occurring Environment, If the Toxin Has Not been Cultivated, Collected or Otherwise Extracted From Its Natural Source"* ........................................................ 9

       6.   *"Prophylactic, Protective, Bona Fide Research"* .................................................. 10

       7.   *"Other Peaceful Purpose"* .............................................................................. 10

     B.   The Structure of § 175 As a Whole Further Illustrates Unconstitutional Vagueness ................ 11

   II.   COUNT THREE MUST BE DISMISSED BECAUSE CONGRESS EXCEEDED ITS AUTHORITY IN VIOLATION OF THE 10TH AMENDMENT IN ENACTING 18 U.S.C. § 175 ....................................................................................... 12

     A.   Section 175(b) Exceeds Congress's Authority Under the Commerce Clause ........................ 12

     B.   Section 175(b) Exceeds Congress's Authority Under the Necessary and Proper Clause, the War Powers Clause, or Any Treaty Power ................................................. 13

   III.   COUNT THREE MUST BE DISMISSED BECAUSE THE "CRUSHED ROSARY PEAS" THAT THE GOVERNMENT ALLEGES MR. CHAMBERLAIN POSSESSED DO NOT CONSTITUTE A TOXIN AS DEFINED BY THE STATUTE AND THE PROSECUTION OF MR. CHAMBERLAIN UNDER THESE CIRCUMSTANCES VIOLATES THE SUPREME COURT'S OPINION IN *BOND* ...................................................................... 14

     A.   The Government Unfairly Conflates "Crushed Rosary Peas" with "Chemically Purified Abrin" ................................................................................... 14

     B.   Like in *Bond*, there is No Clear Indication that Congress Intended to Proscribe the Specific Conduct Alleged Here ................................................................. 18

CONCLUSION ............................................................................................................ 21

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Bond v. United States,*
--- U.S. ---, 134 S. Ct. 2077 (2014) ................................................................. 12, 18, 19, 20

*Bouie v. City of Columbia,*
378 U.S. 347, 351 (964) .............................................................................................. 7

*Grayned v. City of Rockford,*
408 U.S. 104, 108 (1972) ............................................................................................ 7

*Kolender v. Lawson,*
461 U.S. 352, 357 (1983) ............................................................................................ 7

*Sabri v. United States,*
541 U.S. 600, 607-08 (2004) ..................................................................................... 13

*United States v. Crocker,*
260 F. App'x 794 (6th Cir. 2008) .............................................................................. 19

*United States v. Fries,*
2012 WL 689157 (D.Ariz., Feb. 28, 2012) ............................................................... 19

*United States v. Ghane,*
673 F.3d 771 (C.A.8 2012) ........................................................................................ 19

*United States v. Krar,*
134 F. App'x 662 (5th Cir. 2005) .............................................................................. 19

*United States v. Lopez,*
514 U.S. 549 (1995) ................................................................................................... 13

*United States v. Morrison,*
529 U.S. 598, 608 (2000) .......................................................................................... 13

## FEDERAL STATUTES

U.S. Const. amend. X. ................................................................................................ 12
18 U.S.C. § 175............................................................................................... passim
18 U.S.C. § 178............................................................................................... passim

**MISCELLANEOUS**

Olsnes, S. and Pihl, A. Isolation and Properties of Abrin, Eur. J. Biochem. 35, 1973.
  http://onlinelibrary.wiley.com/doi/10.1111/j.1432-1033.1973.tb02823.x/pdf .................................... 14

Roxas-Duncan VI, Smith LA, Of Beans and Beads: Ricin and Abrin in Bioterrorism and Biocrime, J
  Bioterrorism & Biodefense S7 at 2 (2012).......................................................................................... 16

STEVEN G. KALAR
Federal Public Defender
JODI LINKER
Assistant Federal Public Defender
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:     415.436.7700
Facsimile:     415.436.7706
Jodi_Linker@fd.org

Counsel for Defendant CHAMBERLAIN

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RYAN KELLY CHAMBERLAIN II,<br><br>Defendant. | **UNDER SEAL**<br><br>Case No. CR 14-316 VC<br><br>DEFENDANT'S MOTION TO DISMISS COUNT THREE OF THE  SUPERSEDING INDICTMENT & MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF<br><br>Hearing Date: July 7, 2015<br>Time: 1:00 p.m.<br>Court:  The Honorable Vince Chhabria |

TO:     UNITED STATES OF AMERICA, PLAINTIFF; AND MELINDA HAAG, UNITED STATES ATTORNEY, NORTHERN DISTRICT OF CALIFORNIA; AND PHILIP KEARNEY AND ELISE BECKER, ASSISTANT UNITED STATES ATTORNEYS

        PLEASE TAKE NOTICE that on July 7, 2015, at 1:00 p.m., or as soon thereafter as the matter may be heard, defendant Ryan Kelly Chamberlain II will move this Court for an order dismissing Count Three of the Superseding Indictment charging him with a violation of 18 U.S.C. § 175(b), Possession of Biological Toxin.

        The motion is based on this notice and motion, the following Memorandum of Points and Authorities, Fed. R. Crim. P. 12(b), all other applicable constitutional, statutory and case authority, and such argument as may be presented at the hearing of this motion.

        Mr. Chamberlain further requests an evidentiary hearing should any disputed issues of fact arise.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Defendant Ryan Chamberlain is alleged to have possessed a toxin in violation of 18 U.S.C. § 175(b).  The government alleges that Mr. Chamberlain ordered abrin, a toxic substance, on the dark web.[1]  The person from whom Mr. Chamberlain allegedly purchased this abrin has stated to the government that he did not send Mr. Chamberlain chemically purified abrin, but instead mailed crushed up rosary peas.  The laboratory results from the government do not dispute that this mailed substance was, in fact, crushed rosary peas.  Moreover, the government has not alleged that Mr. Chamberlain used this substance to poison anyone or that he threatened to poison anyone.  The evidence shows that the crushed rosary peas never left Mr. Chamberlain's home and were discovered months later when law enforcement searched his home.

As explained in detail below, Mr. Chamberlain moves to dismiss the charge that he violated section 175(b) because the statute is unconstitutionally vague and exceeds Congress's authority, and the conduct alleged is not covered by the statute.

## BACKGROUND

### I.    FACTUAL ALLEGATIONS: MR. CHAMBERLAIN IS ALLEGED TO HAVE POSSESSED CRUSHED ROSARY PEAS

The government alleges that Mr. Chamberlain purchased "abrin" over the Tor network (referred to by the government as the "dark web") from an individual named James Christopher Malcolm. Malcolm was located in Vacaville, California and Mr. Chamberlain in San Francisco, California. According to Malcolm, he had concern with Chamberlain's comments about the reason for needing the abrin (specifically, easing the suffering of cancer patients), and he also had unanticipated complications with the synthesis process for abrin, so he did not ship chemically purified abrin to Mr. Chamberlain. Instead, he shipped two clear vials, *each containing **ground rosary peas***, hidden inside a flashlight. *Abrus precatorius*, commonly known as rosary pea, is a plant that contains the toxin abrin.  *See* Declaration of Jodi Linker (hereinafter "Linker Decl."), Ex. A., An Assessment of the Powder from

---

[1] For purposes of this motion, Mr. Chamberlain will summarize certain facts alleged by the government. He does not concede the accuracy of those facts and reserves the right to challenge the government's evidence at trial.

Crushed Rosary Peas in US v. Chamberlain by Dr. George Smith (hereinafter "Smith Report") at 1.

Based on this investigation, on May 31, 2014, law enforcement executed a warrant to search Mr. Chamberlain's residence, 1831 Polk Street, #117, San Francisco, California, for abrin. During the search of Mr. Chamberlain's home, the government allegedly found a small firearm with an obliterated serial number and a single mason jar that the government claims was either a complete destructive device or component parts of a destructive device.[2] During the search, the agents did not identify any toxins, and all presumptive tests were negative for toxins. The agents did find a small amount of a powder in a vial in a flashlight, similar to that described by Mr. Malcolm. This powder was then sent for laboratory analysis.

During the search on May 31, two agents approached Mr. Chamberlain outside of his home and "invited" Mr. Chamberlain to come talk to them in a nearby coffee chop. Mr. Chamberlain went with the officers and spoke to them for some time. Mr. Chamberlain was then "allowed" to leave at his request. After Mr. Chamberlain left – at the explicit permission of the agents – a multi-day national "manhunt" began for him. Three days later, on June 2, Mr. Chamberlain was arrested just a few miles from his home in the Crissy Field parking lot.

That same day, a complaint was filed against Mr. Chamberlain alleging a violation of 26 U.S.C. § 5861(c), possession of an illegal destructive device. On June 12, an indictment was filed alleging the following: Count One, a violation of section 5861(d), possession of an unregistered firearm; Count Two, a violation of 18 U.S.C. § 922(k), possession of a firearm with the manufacturer's serial number removed. On September 25, 2015, a Superseding Indictment was filed alleging an additional count: Count Three, a violation of 18 U.S.C. § 175(b), possession of a toxin. Count three, the toxin charge, is the subject of the instant motion.

The government alleges that its testing of the vials allegedly found in Mr. Chamberlain's apartment returned positive for abrin and, therefore, the charge for violating § 175(b) is warranted. Specifically, the government alleges that its laboratory determined that one vial contained 1.6 milligrams of abrin protein (with a concentration of 0.4 milligrams/ml) and the other contained 1.2

---

[2] Mr. Chamberlain filed a motion for a bill of particulars to more fully understand the government's allegations regarding the destructive device, but this Court denied that motion.

*US v. Chamberlain,* Case No. 14-316 VC;
Def.'s Mtn to Dismiss Count Three          3

milligrams of abrin protein (with a concentration of 0.3 milligrams/ml), totaling 2.8 milligrams of abrin protein. *See* Linker Decl., Ex. A, Smith Report at 5. While acknowledging that a rosary pea would test positive for abrin, the government has not provided any data regarding the concentration of abrin that would be found in a rosary pea itself (prior to chemical purification into refined abrin). Nor has the government provided an estimate regarding the total dry weight of powder it alleges Mr. Chamberlain to have possessed. *Id*.

Thus, the government has offered no evidence to show why the substance Mr. Chamberlain possessed was any more – or less – toxic than possessing legal rosary peas. Despite these deficiencies, the government has charged Mr. Chamberlain with a serious federal offenses and made sweeping and unsubstantiated allegations about the severity of the potential harm, purported weapons of mass destruction, and the grave dangers presented by Mr. Chamberlain's conduct. In reality, however, what Mr. Chamberlain is alleged to have possessed was neither a weapon of mass destruction, nor did it even remotely the potential for serious mass suffering asserted by the government. Instead, what Mr. Chamberlain allegedly possessed was a lawful substance – crushed up rosary peas -- that presented the same risk as rosary peas used in ornaments and religious ceremonies around the world. As such, if section 175(b) makes it illegal to possess such a substance, that statute is unconstitutional on its face and as applied to Mr. Chamberlain.

## II.   THE CHARGED STATUTE: 18 U.S.C. § 175(b), POSSESSION OF A TOXIN

Count three of the Superseding Indictment alleges the following:

> On or about May 31, 2014, in the Northern District of California, the defendant, RYAN KELLY CHAMBERLAIN II, knowingly possessed a biological agent, toxin, and delivery system, to wit, abrin, as defined in 18 United States Code, Section 178(2), which was not in its naturally occurring form, and was of a type and in a quantity that, under the circumstances, was not reasonably justified by a prophylactic, protective, bona fide research, or other peaceful purpose; all in violation of Title 18, United States Code, Section 175(b).

18 U.S.C. § 175, the statute that Mr. Chamberlain is alleged to have violated provides in its entirety as follows:

///

///

///

(a) In general.--Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin, or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States.

**(b) Additional offense.--Whoever knowingly possesses any biological agent, toxin, or delivery system of a type or in a quantity that, under the circumstances, is not reasonably justified by a prophylactic, protective, bona fide research, or other peaceful purpose, shall be fined under this title, imprisoned not more than 10 years, or both. In this subsection, the terms "biological agent" and "toxin" do not encompass any biological agent or toxin that is in its naturally occurring environment, if the biological agent or toxin has not been cultivated, collected, or otherwise extracted from its natural source.**

(c) Definition.--For purposes of this section, the term "for use as a weapon" includes the development, production, transfer, acquisition, retention, or possession of any biological agent, toxin, or delivery system for other than prophylactic, protective, bona fide research, or other peaceful purposes.

Mr. Chamberlain is only charged with violating subsection (b) of § 175 – mere possession, not for use as a weapon.  The indictment specifies that Mr. Chamberlain is alleged to have knowingly possessed "abrin," as defined by 18 U.S.C. § 178(2).[3]

Section 178(2) provides as follows:

(2) the term "toxin" means the toxic material or product of plants, animals, microorganisms (including, but not limited to, bacteria, viruses, fungi, rickettsiae or protozoa), or infectious substances, or a recombinant or synthesized molecule, whatever their origin and method of production, and includes--

(A) any poisonous substance or biological product that may be engineered as a result of biotechnology produced by a living organism; or

(B) any poisonous isomer or biological product, homolog, or derivative of such a substance;

///

///

---

[3] While the indictment lists ""biological agent, toxin, *and* delivery system," it refers only to the definition of "toxin" at 18 U.S.C. § 178(2), not the definition of a "biological agent" or "delivery system," and explicitly specifies "abrin" as that toxin.

## DISCUSSION

**I.     COUNT THREE MUST BE DISMISSED BECAUSE 18 U.S.C. § 175(b) IS UNCONSTITUTIONALLY VAGUE AND OVERBROAD**

The Due Process Clause requires that "a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).  This fair warning requirement protects a person's right to "steer between lawful and unlawful conduct," *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972), by insisting that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Bouie v. City of Columbia*, 378 U.S. 347, 351 (964) (citation omitted).  Relatedly, a statute may not be so broad and unconstrained as to "encourage arbitrary and discriminatory enforcement." *Kolender*, 461 U.S. at 357.  Vague laws leave the line between lawful and illegal conduct to be drawn "on an ad hoc and subjective basis" by those who enforce the statute, inevitably leading to disparate treatment of similarly situated defendants based on the happenstance of the understanding adopted by particular police officers, prosecutor, judges, and juries. *Id.* at 109.  Section 175(b) gives rise to all of these constitutional concerns; it is both unconstitutionally vague and overbroad on its face.

**A.  The Statute, 18 U.S.C. § 175(b), is Unconstitutionally Vague on Its Face**

Section 175(b) creates an "additional offense" for whoever knowingly possesses any biological agent, toxin, or delivery system of a type or in a quantity that, under the circumstances, is not reasonably justified by a prophylactic, protective, bona fide research, or other peaceful purpose.  Analyzing each part of the statute illustrates the total lack of clarity with respect to what § 175(b) proscribes. This "Additional Offense" was added to § 175 of the PATRIOT Act.  Significantly, during debate over the passage of the PATRIOT Act, Senator Leahy, the Chair of the Senate Judiciary Committee, expressed grave concerns about the constitutionality of this new, "Additional Offense" created at § 175(b):

> **Nevertheless, I remain troubled by the subjectivity of the substantive standard for violation of this new criminal prohibition, and question whether it provides sufficient notice under the Constitution.**  I also share the concerns of the American Society for Microbiology and the Association of American Universities that this provision will have a chilling effect upon legitimate scientific inquiry that offsets any benefit in protecting against terrorism.  While we have tried to prevent against this by creating an explicit exclusion for "bona fide research," **this provision may yet prove unworkable, unconstitutional, or both**.  I urge the Justice Department and the research community to work together on substitute language that would provide prosecutors with a more workable tool.

See Senate Consideration of S. 1510 (October 11, 2001), Arnold & Porter Leg. Hist., PATRIOT-LH 40, *12 (emphasis added).

Each of the unworkable and unconstitutional elements of the statute are addressed below.

### 1. *"Biological Agent, Toxin, or Delivery System"*

First, the statute makes it unlawful to possess any "biological agent, toxin, or delivery system." The statute itself does not define what constitutes a biological agent, toxin or delivery system, but 18 U.S.C. § 178 does. Section 178, however, is impermissibly vague as it provides an incredibly broad and general definition.

Section 178 defines a toxin as "toxic *material* or *product* of plants, animals, microorganisms (including, but not limited to, bacteria, viruses, fungi, rickettsiae or protozoa), or infectious substances, or a recombinant or synthesized molecule, *whatever their origin and method of production*, and includes, (A) any poisonous substance or biological product that *may be engineered* as a result of biotechnology produced by a living organism; or (B) any poisonous isomer or biological *product*, *homolog*, or *derivative* of such a substance."  18 U.S.C. § 178(2) (emphasis added). Indeed, the definition of "toxin" is somewhat circular:  it defines toxin as the "toxic" material or product of certain things, but does not define "toxic."  It includes all products and materials of such plants, animals, micoorganisms, etc., regardless of their origin and method of production, and includes substances or products that are not yet engineered, but *may be* engineered at some unspecified time in the future. It further includes any "poisonous" – without defining what it means to be poisonous – product, homolog or derivative of such substance.

Section 178's definition of toxin is so ambiguous that it would "potentially cover[] everything from solanine in potatoes and green spots on potato chips to amygdalin in apricot pits." Linker Decl., Ex. A, Smith Report at 2.  Indeed, many plants contain toxins, yet the limits of what is considered a "toxin" under § 178 – and therefore is subject to criminal prosecution – is entirely unclear and subject to a prosecutor's subjective interpretation. *See id*.

The problem created by the lack of clarity in the statute is also illustrated in this case, because it is perfectly legal to possess rosary peas, even though they contain a "toxin" and would test positive for abrin, but it is illegal to possess chemically purified abrin.  This begs the question: at what point in the

process of going from rosary peas to chemically purified abrin does it become illegal to possess?

In short, § 178's definition of a toxin does not provide constitutionally sufficient guidance for a person of *ordinary* intelligence – let alone specialized intelligence – to understand what substances are prohibited under § 175.

### 2. *"Reasonably Justified"*

Section 175 extends criminal liability to those who possess a toxin "of a type or in a quantity that, under the circumstances, is not reasonably justified by a prophylactic, protective, bona fide research, or other peaceful purpose." 18 U.S.C. § 175(b). There are several aspects of this provision that are constitutionally vague. It is only unlawful to possess the toxin if it is not "reasonably justified" by one of the listed reasons or other peaceful purpose. That begs the question of who determines whether it is "reasonably justified." This language exemplifies the extraordinarily wide discretion that is given to the prosecution and even a jury to determine what is "reasonably justified. This language also encourages arbitrary arrests and convictions.

Moreover, it is unclear who bears the burden of proving such justification. Is this an affirmative defense where the defendant has the burden to establish a reasonable justification? Is it an objective or a subjective standard? If the defendant is mentally ill and believes that the possession of an extremely deadly toxin in a large quantity is reasonably justified to prevent against aliens overtaking his body, is that "reasonably justified"? Or is the burden on the government to show no reasonable justification? And again, is that by an objective or subjective standard? The language of the statute presents more questions than answers and is therefore unconstitutionally vague.

### 3. *"Type"*

The statute prohibits possession of a toxin of a "type" that is not reasonably justified by certain enumerated purposes. However, the statute does not explain what is meant by "type" as opposed to the definition of a toxin itself. That is, the statute refers to § 178(2) to define what is considered a "toxin." That, in itself, appears to define the "type." Yet the language of § 175 suggests that there must be something *more* to a prohibited substance – its "type." What "type" of a toxin can be justified and what "type" cannot? The vagueness of that language is illustrated by the instant case where Mr. Chamberlain is alleged to have possessed crushed rosary peas, but not chemically purified abrin. Are crushed rosary

peas a "type" that is "reasonably justified?"  What if Mr. Chamberlain had an entire, whole rosary pea?  The statute does not sufficiently explain what is meant by "type" such that a person of ordinary intelligence would know what is prohibited.

### 4. "Quantity"

Section 175 also prohibits a "quantity" that is not reasonably justified.  Again, how much is a justifiable quantity?  Is an unlawful quantity based on what an object may potentially become, *i.e.*, how much of chemically purified abrin could be produced *from* a whole rosary pea?  Or rather, is the "quantity" based on how much harm can be done even though § 175(b) is an "additional offense" that does not require the possession of a substance "for use as a weapon?"  *Cf.* 18 U.S.C. § 175(a).  Looking to quantity suggests a relationship to a substance's harmfulness even though the statute explicitly is designed to cover something different.  A person of ordinary intelligence is left uninformed as to what is prohibited.

### 5. "Naturally Occurring Environment, If the Toxin Has Not been Cultivated, Collected or Otherwise Extracted From Its Natural Source"

Section 175(b) excludes a substance from the definition of a toxin if it is "in its naturally occurring environment, if the biological agent or toxin has not been cultivated, collected, or otherwise extracted from its natural source."  The statute provides no definition provided for what constitutes a "naturally occurring environment."  According to Dr. Smith, this "is not a phrase seen or used in the scientific literature."  Linker Decl., Ex. A, Smith Report at 2.  If it is unclear to a scientist, such language is impermissibly vague for a lay person.

Moreover, the statute does not define when a toxin has been "cultivated, collected, or otherwise extracted from its natural source," though the definition of toxin itself suggests that it often will have to have been so cultivated, collected, or extracted because it must be a "material or product of plants," etc.  *See* 18 U.S.C. § 178(2).  Regardless, simply parsing the words in that clause – set among double negatives and an "if" – is challenging enough for a scientist or lawyer, let alone providing sufficient clarity for a lay person as to what is and what is not is prohibited.

///

///

### 6.  *"Prophylactic, Protective, Bona Fide Research"*

Three of the enumerated "legitimate" purposes for possession of a toxin are "prophylactic, protective, [and] bona fide research."  Section 175, however, does not define any of these terms.  Nor does § 178.  What is "bona fide research" versus non-bona fide?  If someone is an amateur scientist who performs experiments in his garage for nothing more than entertainment, is that "bona fide" research?  Dr. Smith reports that "[t]he Internet has made information on poisoning and toxins, including abrin, widespread."  Linker Decl., Ex. A, Smith Report at 3.  That widespread information then "generates a great deal of human curiosity."  *Id*.  Is basic human curiosity a protected lawful activity?  What if someone researches the truth of fictionalized television depictions of toxin creation to see if fiction can be made reality?  Take a show from the 1980's, *McGyver*, in which the protagonist creates technical solutions to problems out of everyday items.  What if one of those items is a potentially toxin and someone wants to test the accuracy of the show's portrayal?  Is that research considered "bona fide"?  What is someone is dying of cancer and wants to use a substance for euthanasia?  Is euthanasia a prophylactic or protective purpose?  The scenarios of questionable activities are endless and a person of ordinary intelligence is not sufficiently alerted to what is prohibited conduct.

### 7.  *"Other Peaceful Purpose"*

Finally, § 175(b) sets forth a catchall exception for "other peaceful purposes," but this, too, is impermissibly vague and fails to sufficiently identify the bounds of prohibited conduct.  Section 175(b) is completely unclear as to what would or would not be a peaceful purposes and raises the serious problem of whether it simply allows the government to be the ultimate arbiter of what it finds "peaceful" versus "suspicious."  Is it a peaceful purpose to possess a toxin out of curiosity, however morbid that curiosity may be, without any intent to harm another?  Is it a peaceful purpose to possess a toxin with the intent to commit suicide?  Is it a peaceful purpose to be curious about what types of substances can actually be purchased on the internet?  It is a peaceful purpose to research the accuracy of claims that a substance can in fact be harmful?

When a statute is vague, as § 175(b) is here, it does not give an ordinary person sufficient notice to allow a person to bring her/his actions into compliance with the law; nor does it allow a jury or a court to determine who is fairly in violation of the law and who is not.  Instead, a vague statute allows

for the exact thing the Due Process Clause is designed to protect against: arbitrary and discriminatory enforcement of a statute without fair warning – in language a person of ordinary intelligence would understand – of what the law intends to prohibit.  Section 175(b)'s various and sundry provisions fit that description: the statute is unconstitutionally vague.

**B.  The Structure of § 175 As a Whole Further Illustrates Unconstitutional Vagueness**

While the entirety of § 175 is quoted above, in general § 175(a) makes it unlawful for an individual to possess a toxin "for use as a weapon."  Section 175(c) defines "for use as a weapon" to include the possession of a toxin for something *other than* a "peaceful purpose," which itself includes prophylactic, protective, bona fide research, or any other unspecified "peaceful purpose."  Thus, one is guilty under § 175(a) if s/he possess a toxin for something other than a peaceful purpose because that necessarily means s/he has it "for use as a weapon."  And if an individual's possession of a toxin was *not* for use as a weapon, then the possession must, by definition, be for a peaceful purpose.

Section 175(b), on the other hand, makes it unlawful to possess a toxin for something other than a peaceful purpose, but does not require that the possession be "for use as a weapon."  However, if "use as a weapon" under § 175(a) is anything "other than" a peaceful purpose, § 175(b) is rendered meaningless because one could only possess a substance for something other than a peaceful purpose if it is "for use as a weapon."  This further illustrates § 175(b)'s complete lack of clarity because it is impossible for an ordinary person – let alone a lawyer – to ascertain what particular conduct could be considered possession that is for "other than a peaceful purpose," but which is also not for "use as a weapon."   Under the language of § 175(b), an ordinary person cannot understand what non-peaceful, yet non-weapon, purpose is prohibited.

In sum, § 175(b) is unconstitutionally vague and, therefore, Count Three charging Mr. Chamberlain with a violation of § 175(b) must be dismissed.

///
///
///
///
///

*US v. Chamberlain,* Case No. 14-316 VC;
Def.'s Mtn to Dismiss Count Three                    11

1  **II.    COUNT THREE MUST BE DISMISSED BECAUSE CONGRESS EXCEEDED ITS**
2  **AUTHORITY IN VIOLATION OF THE 10TH AMENDMENT IN ENACTING 18**
   **U.S.C. § 175**

3      The Tenth Amendment provides that "[t]he powers not delegated to the United States by the

4  Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

5  U.S. Const. amend. X.  Section 175 violates the Tenth Amendment because it breaches the principles of

6  federalism by permitting federal prosecution of localized offenses and is not based on a valid exercise of

7  constitutional authority.

8      Like the chemical weapons statute at issue in in *Bond v. United States*, --- U.S. ---, 134 S. Ct.

9  2077 (2014), § 175 does not contain a federal interest element or state a constitutional basis for its

10 enactment.  While the Supreme Court declined to address the constitutional issues in that case because it

11 overturned Bond's conviction on other grounds, the Court should address that question here.  Neither the

12 Commerce Clause, nor the Necessary and Proper Clause in connection with the Treaty Power, support

13 the expansive wording of § 175, let alone the present prosecution.

14     **A.  <u>Section 175(b) Exceeds Congress's Authority Under the Commerce Clause</u>**

15     By its terms, § 175(b) exceeds the scope of Congress's authority under the Commerce Clause

16 because it purports to regulate non-commercial, intrastate activity – the mere possession of a toxin – that

17 does not substantially affect interstate commerce.  Whether § 175(a) and the portion of that statute

18 which addresses foreign states is constitutional need not be addressed by this Court because there is no

19 allegation of such activity in this case.  Section 175(b), however, is facially invalid and invalid as

20 applied to Mr. Chamberlain because it contains no requirement that the conduct made use of channels of

21 interstate commerce, involved instrumentalities in commerce, or had a substantial effect on commerce.

22 *See United States v. Lopez*, 514 U.S. 549 (1995) (holding that Congress exceeded the scope of its

23 Commerce Clause powers in statute that criminalized gun possession near schools).

24     The Supreme Court has emphatically reminded that lower courts and Congress that "even under

25 our modern, expansive interpretation of the Commerce Clause, Congress' regulatory authority is not

26 without effective bounds."  *United States v. Morrison,* 529 U.S. 598, 608 (2000) (citing *Lopez*, 514 U.S.

27 at 557).  In reviewing its Commerce Clause jurisprudence as set forth in *Morrison* and *Lopez*, the

28 Supreme Court stated the following:

1
2
3
4
5
6
7

In *Lopez* and *Morrison,* the Court struck down federal statutes regulating gun possession near schools and gender-motivated violence, respectively, because it found the effects of those activities on interstate commerce insufficiently robust. The Court emphasized the noneconomic nature of the regulated conduct, commenting on the law at issue in *Lopez,* for example, "that by its terms [it] has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." 514 U.S., at 561, 115 S. Ct. 1624. The Court rejected the Government's contentions that the gun law was valid Commerce Clause legislation because guns near schools ultimately bore on social prosperity and productivity, reasoning that on that logic, Commerce Clause authority would effectively know no limit. Cf. *Morrison, supra,* at 615–616, 120 S. Ct. 1740 (rejecting comparable congressional justification for Violence Against Women Act of *608 1994). In order to uphold the legislation, the Court concluded, it would be necessary "to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Lopez,* 514 U.S., at 567, 115 S. Ct. 1624.

8
9
10
11
12

*Sabri v. United States*, 541 U.S. 600, 607-08 (2004). Section 175(b) would similarly require this Court to "pile inference upon inference" in order to justify the legislation under the Commerce Clause, and in so doing, would result in a grant of "general police power of the sort retained by the States." *Id.* The statute is an unconstitutional exercise of legislative authority under the Commerce Clause because the statute regulates non-economic activities not affecting interstate commerce.

13
14
15
16
17
18
19
20

Section 175(b) goes well beyond any potentially legitimate exercise of authority, punishing any person who possess any toxin even within purely local bounds and without any tie whatsoever to international, or intra-national, activities. Moreover, section 175(b) does not even require that the possession be for "use of a weapon." The statute could be used to prosecute a defendant like Carol Ann Bond for merely possessing the toxins she had even without the assaultive conduct alleged. Such an exercise of power is beyond that permitted by Article I, section 8, or any other part of the Constitution. The statute is invalid on its face and as applied here.

21

**B.   Section 175(b) Exceeds Congress's Authority Under the Necessary and Proper Clause, the War Powers Clause, or Any Treaty Power**

22
23
24
25
26
27

The government may seek to justify the enactment of section 175(b) under Congress's Necessary and Proper Clause, the War Powers Clause, or any power to enact a treaty. No such authority, however, supports the statute at issue here. Most notably, section 175(b) criminalizes mere possession of a toxin and was not passed to implement a treaty. While section 175 was originally enacted in 1990 to implement the 1972 Biological Weapons Convention, the original statute did *not* contain the provision at issue here: what is now section 175(b). That section was added on October 26, 2001 as part of the

28

PATRIOT Act.[4]  Congress added this "additional offense" without requiring that the toxin be possessed for any harmful purpose and without requiring any foreign connection, terrorism related-activity, or commercial activity.  Thus, there is no valid treaty power and this statute reaches purely domestic subject matter, primarily local criminal conduct, without any nexus to foreign relations.  Nonetheless, should the government assert any such argument, Mr. Chamberlain will respond more thoroughly in his reply brief.

**III.   COUNT THREE MUST BE DISMISSED BECAUSE THE "CRUSHED ROSARY PEAS" THAT THE GOVERNMENT ALLEGES MR. CHAMBERLAIN POSSESSED DO NOT CONSTITUTE A TOXIN AS DEFINED BY THE STATUTE AND THE PROSECUTION OF MR. CHAMBERLAIN UNDER THESE CIRCUMSTANCES VIOLATES THE SUPREME COURT'S OPINION IN *BOND***

**A.   <u>The Government Unfairly Conflates "Crushed Rosary Peas" with "Chemically Purified Abrin"</u>**

Possession of rosary peas is undoubtedly legal – people use rosary peas for ornamental, religious and other purposes.  Chemically purified abrin is undoubtedly illegal.  Rosary peas (*abrus precatorius*) contain minute quantities of abrin, which is a "phytotoxin" -- a poison produced by a plant.  What Mr. Chamberlain is alleged to have possessed are crushed rosary peas – "rosary peas that were crushed or grated by a mill with nothing more elaborate done."  Linker Decl., Ex. A, Smith Report at 3.  While the government unfairly and without support equates "crushed rosary peas" with "chemically purified abrin," the statute does not.  The Court must dismiss Count Three because what Mr. Chamberlain is alleged to have possessed – crushed rosary peas – is not a toxin as a matter of law.

18 U.S.C. § 178(2) defines "toxin" as "the toxic material or product of plants."  It does not define a toxin as a "toxic plant," but rather only the "toxic material" or "toxic … product" *of* such a plant.  The crushed rosary peas in this case, which were not refined and from which abrin was not extracted, do not qualify as a "toxin" under this definition.  Reading toxic plants into this definition would undermine Congress's determination that a toxin be "material" or "product" of a plant, but not the plant itself.

///

///

///

---

[4] Despite the significant breadth of the PATRIOT Act's various statutory changes, the statute was enacted only six weeks after the terrorist attacks of September 11, 2001.

Abrin is a toxin that is found in the seeds of *Abrus precatorius* L. (Fabaceae or Leguminosae). A. precatorius has acquired >30 common names, such as jequirity, rosary pea, rati or ratti, crab's eye, John crow bead, precatory bean, love bean, Indian licorice, akar saga, giddee giddee, or jumbie bead, and numerous other locally used common names, from its many uses. "Abrus" means beautiful or graceful and is used to describe the appearance of the seed; "precare" from which the species name is derived, means to pray, references its common name in rosaries. A. precatorius is native to Southeast Asia, possibly India or of Guinea in Africa, but grows in tropical and subtropical areas of the world where it has been introduced. In the U.S., it is found in Alabama, Arkansas, Florida, Georgia, Hawaii, Puerto Rico and the Virgin Islands. A. precatorius is a perennial climber and has a tendency to become weedy and invasive where it has been introduced. The Florida Exotic Pest Plant Council's 2011 Record of Invasive Plant Species listed *A. precatorius* under Category I.

Though lacking the oil of castor seeds, the brightly colored *A. precatorius* seeds are popularly used as beads in rosaries and other jewelry and in toys or percussion instruments. In Trinidad in the West Indies, the seeds are strung into bracelets and worn around the wrist or ankle to ward off jumbies or evil spirits and "mal-yeux" (evil eye). The Tamils use Abrus seeds of different colors (red, black, white, and green varieties). Also, because of their uniform weight, Abrus seeds were formerly used in Southeast Asia for weighing gemstones; the Koh-iNoor or mountain of light diamond belonging to the British crown, was reportedly ascertained by this means. The Ganda system of weight was based on multiples of four Abrus seeds.

*A. precatorius* seeds, roots and leaves have a long history in ethnobotany and various preparations were used for a panoply of purposes such as an analgesic, aphrodisiac, abortifacient, anticonvulsant, laxative, sedative, insecticide, herbal remedy to treat chronic eye diseases, fevers, coughs and colds, worms, venereal diseases and other conditions. All parts of *A. precatorius* plant are toxic, but the seeds contain the highest concentration of toxins. Poison absorbed through a prick on the finger when stringing for beads can also be a killer. In India and Sri Lanka, seed extracts have been used to poison animals and humans. Additionally, some African and Madagascar tribes used abrin as an ordeal poison.

Abrin can be made in several forms, i.e., powder, mist, pellet, or it can also be dissolved in water. Pure abrin is a yellowish-white amorphous powder, and like ricin, is very stable (Budavari, 1989). The medical potential of abrin for the treatment of cancers has been investigated. It was used with some clinical success as an analgesic in terminally-ill patients. Ethanolic extracts of Abrus leaves were also demonstrated to possess d-tubocurarine-likeneuromuscular blocking activity. Further, abrin's use as a tool for research, e.g., cellular function, has been described.

Roxas-Duncan VI, Smith LA, <u>Of Beans and Beads: Ricin and Abrin in Bioterrorism and Biocrime</u>, J Bioterrorism & Biodefense S7 at 2 (2012) (footnotes omitted).

Like abrin, there are thousands of phytotoxins in common plants, including: belladonna, hemlock, larkspur, foxglove, cassava, popply, nettles, buckwheat and mistletoe. The toxic component of mistletoe, viscumin, is classified as the same type of phytotoxin as abrin. *Id.* at 1. Of course, mistletoe is legal to possess.

Crushed rosary peas themselves are not abrin as that term is used by the government. Rather, all rosary peas contain (*i.e.,* would test positive for) abrin, yet the process necessary to extract the abrin

protein from rosary peas to make the toxic substance referenced by the government requires several steps.  It requires "use of a high speed centrifuge, dialysis membranes, and specialized materials (DEAE-cellulose and Sepharose), among other things, for the isolation of the toxin."  Linker Decl., Ex. A., Smith Report at 1.  "This refining procedure cannot be done in the home" and "[t]he materials and methods are not available to laymen;" rather, "[t]he ability to carry it out is found only in those trained and educated in research lab protein chemistry."  *Id.*[5]

Nonetheless, the government carelessly and recklessly – if not deliberately – attempts to make this case appear more serious than it is by substituting chemically purified abrin with what Mr. Chamberlain is actually alleged to have possessed: crushed rosary peas.  The affidavit in support of the government's warrant to search Mr. Chamberlain's apartment, the proffers before this Court and the Magistrate Court to support the detention of Mr. Chamberlain, the government's numerous statements to the press, and the testimony before the Grand Jury, demonstrate that the government has greatly exaggerated its language and has perhaps purposefully conflated "chemically purified abrin" with "crushed rosary peas."  The two substances are very different and the distinction carries practical, scientific and legal significance.

For example, in the search warrant affidavit, the agent states under oath that he "confirmed on May 29, 2014 with the Chief of the Scientific Response Unit of the FBI National Laboratory in Quantico, Virginia that the total amount of ***chemically pure abrin*** potentially in these vials would be enough to constitute [conservatively] hundreds of lethal doses of the toxin if metabolized in the human body."  Exhibit A to Amended Complaint, Search Warrant Affidavit, ¶ 34.  However, in that same paragraph, the agent acknowledges that *no* chemically pure abrin was in the vials allegedly sent to Mr. Chamberlain, and instead what was sent was merely crushed rosary peas.  The agent goes on to state that the "ground abrin similar to the type shipped" by Malcolm to Chamberlain – without clarifying whether he means ground rosary peas or chemically pure abrin – "would suffer little or no degradation over time if properly maintained in a dry state."  Nowhere in the search warrant affidavit does the agent mention the distinction between crushed rosary peas and chemically purified abrin; nor does the search warrant

---

[5] A more detailed explanation of this complicated process can be found in the article cited in footnote 1 of Dr. Smith's Report, Olsnes, S. and Pihl, A. Isolation and Properties of Abrin, Eur. J. Biochem. 35, 1973. http://onlinelibrary.wiley.com/doi/10.1111/j.1432-1033.1973.tb02823.x/pdf

affidavit discuss the legality of possessing crushed rosary peas.

The testimony presented to the Grand Jury suffers the same defect.  There, despite the government's acknowledgement that what was allegedly mailed by Mr. Malcolm to Mr. Chamberlain was crushed rosary peas and not chemically purified abrin, the government presented to the Grand Jury a lethality analysis specific to chemically purified abrin and did not explain to the grand jury that the substance Mr. Chamberlain was alleged to have possessed had not been processed into chemically purified abrin, but was instead merely crushed rosary peas, many steps from becoming chemically purified abrin.  Nor is there any evidence that Mr. Chamberlain had any of the equipment necessary to convert the crushed rosary peas into chemically purified abrin.

The government asserts that the concentration of abrin found in the substance seized from his apartment was 0.4 milligrams/ml in one vial and 0.3 milligrams/ml in the other vial, but the government fails to state that this same abrin concentration would likely be found in the clearly lawful rosary pea. Linker Decl., Ex. A, Smith Report at 5.  "Having gone through no chemical purification process, the concentration is expected to be the same in the crushed rosary pea as the intact rosary pea."  *Id*.

 Nor has the government provided any evidence of the total dry weight of powder allegedly possessed by Mr. Chamberlain.[6]  *Id*. at 4.  This distinction is incredibly relevant, as the government's lethality analysis is based on the quantity of abrin allegedly possessed by Mr. Chamberlain.  That is, the government claims that Mr. Chamberlain possessed hundreds of doses of deadly toxin, yet the basis for this conclusion is mystifying since it nowhere provides any analysis of how much powder Mr. Chamberlain allegedly possessed, nor has it provided a lethality analysis for crushed rosary peas as opposed to chemically purified abrin.  Moreover, as explained by Dr. Smith, the lethality analysis presented by the government changes in different reports.  *Id*. at 5.  At one point, the government's analysis yields "hundreds" of lethal doses; another analysis would yield only four lethal doses.  *Id*. at 4-5.  Regardless, Dr. Smith concludes that the government's conclusion that Mr. Chamberlain possessed

---

[6] Throughout his report, Dr. Smith explains the calculations made by the government's lab regarding quantity, concentration and lethality.  The figures from the government, however, do not contain an estimate of the dry weight of powder allegedly possessed by Mr. Chamberlain.  That is, the government seized two vials allegedly containing a powder and the government has not provided a calculation of how much powder was in each of those two vials.

hundreds of lethal doses is "unrealistic" and not scientifically supported.  *Id.*

### B.  Like in *Bond*, there is No Clear Indication that Congress Intended to Proscribe the Specific Conduct Alleged Here

In *Bond*, the Supreme Court addressed the conviction of defendant Carol Anne Bond for violating a section of the Chemical Weapons Convention Implementation Act of 1998, 18 U.S.C. § 229, which makes it a crime to knowingly "possess[] or use . . . any chemical weapon" and contains a similar "peaceful purposes" exception.  The Court considered whether § 229 "reaches a purely local crime: an amateur attempt by a jilted wife to injure her husband's lover, which ended up causing only a minor thumb burn readily treated by rinsing with water . . . "  134 S. Ct. at 2083.  The Supreme Court declined to consider the constitutionality of § 229, but held that the statute was inapplicable to Bond's conduct based on principles of federalism inherent in our constitutional structure.  *See id.* at 2087.  Applying the Supreme Court's analysis to the instant case, it is clear that the inchoate possession of crushed rosary peas (even if labeled abrin) in the quantity possessed by Mr. Chamberlain without any evidence of threats or harms to others, is similarly outside the ambit of § 175(b).  Accordingly, County Three must be dismissed.

To avoid the larger constitutional questions raised in *Bond* (validity under the 10th Amendment), the Court overturned the defendant's conviction based on the ambiguity of the federal statute:

> These precedents make clear that it is appropriate to refer to basic principles of federalism embodied in the Constitution to resolve ambiguity in a federal statute. In this case, the ambiguity derives from the improbably broad reach of the key statutory definition given the term—"chemical weapon"—being defined; the deeply serious consequences of adopting such a boundless reading; and the lack of any apparent need to do so in light of the context from which the statute arose—a treaty about chemical warfare and terrorism. We conclude that, in this curious case, we can insist on a clear indication that Congress meant to reach purely local crimes, before interpreting the statute's expansive language in a way that intrudes on the police power of the States. See *Bass, supra,* at 349, 92 S. Ct. 515.

*Bond*, 134 S. Ct. at 2090.

The same is true here, where there is an improbably broad reach of many key statutory definitions; the deeply serious consequences of adopting such a boundless reading; and the lack of any apparent need to do so in light of the context from which the statute arose – an international treaty on biological weapons and the PATRIOT Act.  There is no clear indication that Congress meant to reach the local conduct involved here.

In holding that § 229 did not apply, the Court also considered the substances used by Bond, as well as the manner in which she used them, and whether state criminal statutes were applicable.  *Id.* at 2093.  While acknowledging that the chemical compounds "might be chemical weapons if used, say, to poison a city's water supply," the Court looked at the particular conduct to determine if the ambiguous statute should be used to reach to Ms. Bond's clearly illegal conduct.  *Id.* at 2091.  The Court indicated that the proper scope of the criminal statute involved terrorist plots or the possession of extremely dangerous substances with the potential to cause severe harm to many people.  *Bond*, 134 S. Ct. at 2092 (citing *United States v. Ghane*, 673 F.3d 771 (C.A.8 2012) (defendant possessed enough potassium cyanide to kill 450 people); *United States v. Crocker*, 260 F. App'x 794 (6th Cir. 2008) (defendant attempted to acquire VX nerve gas and chlorine gas as part of a plot to attack a federal courthouse); *United States v. Krar*, 134 F. App'x 662 (5th Cir. 2005) (per curiam ) (defendant possessed sodium cyanide); *United States v. Fries*, 2012 WL 689157 (D.Ariz., Feb. 28, 2012) (defendant set off a homemade chlorine bomb in the victim's driveway, requiring evacuation of a residential neighborhood)).  "The Federal Government undoubtedly has a substantial interest in enforcing criminal laws against assassination, terrorism, and acts with the potential to cause mass suffering.  Those crimes have not traditionally been left predominantly to the States, and nothing we have said here will disrupt the Government's authority to prosecute such offenses." *Bond*, 132 S. Ct. at 2092.

Applying a similar analysis to the instant case leads to the same conclusion:  just as in *Bond,* Mr. Chamberlain's crime was purely local, caused no injury, and involved a crushed rosary pea, rather than a purified toxin.  Even more, there is absolutely no evidence that Mr. Chamberlain ever used, threatened to use, or attempted to use the crushed rosary peas to harm anyone – even less harmful behavior than the defendant in *Bond*, who actually did use the chemicals against another person.  There is no evidence that the substance ever left Mr. Chamberlain's apartment.

Just as in *Bond*, the government has no evidence that the substance allegedly possessed by Mr. Chamberlain was an extremely dangerous substance with "the potential to cause mass suffering," which weighs strongly in favor of holding that § 175(b) does not reach this case.  The potential to cause mass suffering is not an element of section 175(b); but the potential to cause mass suffering, or inability to do so, is extremely relevant to determining the applicability of *Bond* – and any federal interest – to the

1    instant case.

2        The expert report from Dr. Smith further explains why the statute does not – or should not –

3    cover this conduct.  While the discovery from the government, including many of the 302s from the FBI,

4    references a "Weapon of Mass Destruction," and looks at this investigation and prosecution as involving

5    "WMDs," the government has offered no such evidence.  Linker Decl., Ex. A, Smith Report at 1.  Dr.

6    Smith explains that while the government has not made any determination of the total dry weight of

7    powder allegedly possessed by Mr. Chamberlain, based on the government's evidence, Mr. Chamberlain

8    was sent a very small quantity of crushed rosary peas by Mr. Malcolm: "only 1/20 to 1/5 or as much as a

9    bit over 1/3 of the weight of one rosary pea, as powder, into each of his sample tubes."  *Id.* at 4.  Dr.

10   Smith concludes that it is not possible that "one rosary pea, or a very small amount of powder that is a

11   fraction of one after the shell is removed (or possibly not) is something that could kill hundreds of

12   people" as the government has asserted.  Dr. Smith explicitly concludes that "[t]he small amounts of

13   abrin-containing powder from rosary peas in this case do not [constitute a weapon of mass destruction],"

14   *id.* at 1, nor could such a small amount of powder even "be considered a weapon," *id.* at 7.

15       As explained above, while the government relies upon lethal dose values for "pure abrin," such

16   pure abrin was not found in this case.  *Id.*  The substance allegedly possessed by Mr. Chamberlain was

17   many complicated steps removed from becoming chemically purified abrin, *id.* at 1, and Mr.

18   Chamberlain did not possess the equipment necessary to convert the crushed rosary peas into chemically

19   purified abrin.

20       In the public record, there has never been an incident of a lay person purifying or producing

21   refined abrin; nor are there any examples of abrin poisonings as criminal attacks or acts of terrorism.  *Id.*

22   at 5 & 7.  Mr. Chamberlain's situation is no different.  *Id.* at 5.  While the government presents evidence

23   of the significant lethality of refined or chemically purified abrin, that is *not* what Mr. Chamberlain is

24   alleged to have possessed, and the government has provided no lethality analysis for the crushed rosary

25   peas he is alleged to have possessed.

26       The actual evidence of what Mr. Chamberlain has done is a far cry from the government's

27   dramatic rhetoric about a serious threat it claims to have thwarted.  As Dr. Smith summarized:

28   ///

1
2
3
4

All this is mentioned because in this case what is present is a vanishingly small amount of powder, less than one rosary pea in weight. Rosary peas are in beadwork and jewelry, advertised and sold on eBay and Etsy. Classified as a noxious weed in Florida, it can be pulled out by hand. Rosary peas have been in contact with people for a long time with all that entails. Thirty five milligrams of powder, the largest estimated value in one tube in a spread of values included in discovery, is a little more than a third of one rosary pea. It is not ten rosary peas, or twenty, or even a few. Such a small amount of powder can hardly be considered a weapon.

5

*Id*. at 7.

6

Thus, like *Bond*, Mr. Chamberlain's alleged conduct, including the substance he is alleged to

7

have possessed, the quantity he is alleged to have possessed it in, and the lack of any evidence of

8

harming anyone or the intent to harm others, evidences no "potential to cause mass suffering," and is not

9

a "toxic material or product" intended to be within the scope of 18 U.S.C. § 175(b).

10

### **CONCLUSION**

11
12

For the foregoing reasons, Mr. Chamberlain respectfully requests that the Court dismiss Count

13

Three of the Superseding Indictment, an alleged violation of 18 U.S.C. § 175(b), possession of a toxin.

14

Dated: May 19, 2015                                     Respectfully submitted,

15
16

JODI LINKER
Assistant Federal Public Defender

17
18
19
20
21
22
23
24
25
26
27
28